## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Miguel Morales, | |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| City of Chicago, John Halloran, Kenneth Boudreau, James O'Brien, Gerald Carroll, Bernard Ryan, Ellen Weiss, Special Representative of the Estate of Michael Pochordo, Special Representative of the Estate of Robert A. McGuire, J. Redmond # 20248, and other as-yet unidentified current or former Chicago police officers, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff, Miguel Morales, by and through his attorneys, Hughes Socol Piers Resnick & Dym, Ltd., and complaining of Defendants City of Chicago, John Halloran, Kenneth Boudreau, James O'Brien, Gerald Carroll, Bernard Ryan, Ellen Weiss, Special Representative of the Estate of Michael Pochordo, Special Representative of the Estate of Robert A. McGuire, J. Redmond # 20248, and other as-yet-unidentified current or former Chicago police officers alleges as follows:

### Introduction

1.      Plaintiff Miguel Morales was wrongfully convicted of a 1993 homicide that he did not commit. He spent over 22 years in prison and lived under the cloud of a first-degree murder conviction until his conviction was vacated and he was awarded a Certificate of Innocence.

2.      Plaintiff's wrongful conviction came about as a direct result of misconduct by some of the most notoriously abusive detectives in Chicago Police Department history: John Halloran,

Kenneth Boudreau, and James O'Brien. These and other CPD detectives worked together to intentionally frame Plaintiff and his co-Defendants of a crime they did not commit.

### Jurisdiction and Venue

3.       This is an action brought pursuant to 42 U.S.C. § 1983 and Illinois law.

4.       This Court has jurisdiction over Plaintiff's § 1983 claims pursuant to 28 U.S.C § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C § 1367.

5.       Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

### Parties

6.       Plaintiff Miguel Morales is a 51-year-old man who spent over 22 years in prison for a crime he did not commit.

7.       At all times relevant to this complaint, John Halloran, Kenneth Boudreau, James O'Brien, Gerald Carroll, Bernard Ryan, Ellen Weiss, Michael Pochordo, Robert A. McGuire, and J. Redmond # 20248, (hereinafter "Defendant Officers") were Chicago Police Department detectives acting under the color of law and within the scope of their employment for the City of Chicago.

8.       On information and belief, Michael Pochordo and Robert A. McGuire are deceased. Plaintiff intends to seek appointment of Special Representatives of their Estates.

9.       Defendant City of Chicago is an Illinois municipal corporation that employed each of the Defendant Officers listed above.

**Facts**

**The Homicide and Initial Investigation**

10. On February 2, 1993 a 19-year-old man named Hector Olague was fatally shot while standing in a parking lot near 50th and Pulaski Streets in Chicago, Illinois. The shooting occurred around lunchtime near Curie High School and was witnessed by several teenagers who were on their school lunch break.

11. In media accounts following the shooting, a CPD detective stated it was "mass confusion" at the scene following the shooting.

12. Detectives transported 15-20 teenage witnesses from the scene to Chicago Police Department Area 1 for questioning.

13. The teenage witnesses gave detectives vague descriptions of two people believed to be the shooter and an accomplice, but detectives knew from these interviews that none of the teenage witnesses saw the offenders well enough to be able to make an identification.

14. No physical evidence was obtained from the scene and no weapon was recovered.

**Defendants Halloran and Boudreau "Solve" The Case**

15. After more than a week passed without any leads, Defendants John Halloran and Kenneth Boudreau decided they were going to "solve" the case, whatever it took.

16. During the early morning hours of February 10, 1993, Defendants Halloran and Boudreau arrested a teenage boy named John Willer.

17. At the time, Willer was asleep at the home of his friend.

18. Halloran and Boudreau gained entry to the home, woke Willer up, and instructed him to gather his belongings because they were taking him to Area 1.

19.     At Area 1, Halloran and Boudreau placed Willer in a small room where they interrogated him for hours.

20.     During the interrogation, Defendants told Willer that they knew Willer and three of his friends were involved in the shooting of Hector Olague.

21.     Halloran and Boudreau told Willer that they had received a phone call from a girl who informed them that Willer was involved in the murder.

22.     Halloran and Boudrau also threatened Willer that they would put him in a lineup where they would arrange for Willer to be identified as the shooter regardless of his guilt or innocence.

23.     Halloran and Boudreau continually pressed Willer to make a statement implicating himself, but Willer denied his involvement. When Willer denied his involvement or otherwise did not tell Defendants what they wanted to hear, Defendants struck him, hitting him in the chest, arms, and face.

24.     During the interrogation, Halloran and Boudreau were at times joined by other Defendant Officers or other as-yet-unidentified CPD Detectives whose identities Plaintiff cannot determine without discovery. These other detectives observed Halloran and Boudreau's threats and abuse and did nothing to stop it.

25.     As an alternative to implicating himself and his friends, Defendants presented Willer with the option of implicating another group of boys in the crime, including Miguel Morales. Defendants threatened that if Willer did not cooperate with them, he would get charged with murder, but that if he did cooperate with them, he could go home. They showed Willer a photo of Morales and fed Willer details about Morales to include in a false statement.

26.     After spending more than 22 hours in an interrogation room at Area 1 and being subjected to repeated threats and physical abuse by Halloran and Boudreau, Willer's succumbed. He signed a false written statement that the Defendants fabricated implicating Morales.

27.     According to Willer's false statement, Willer had a phone call with Morales during which Morales supposedly made a statement implicating himself (Morales) and Nicholas Escamilla in the shooting.

28.     Defendant Officers continued to hold Willer for hours after he made the false statement, releasing him only after he repeated his false statement to a grand jury.

29.     Based on Willer's statement, Defendant Officers Halloran, Boudreau, Carrol, O'Brien, McGuire, and Ryan went to locate and arrest Escamilla, Reyna, and Morales.

30.     At the time, Escamilla was 20 years old, Morales was 19 years old, and Reyna was 15 years old.

31.     After taking Escamilla, Morales, and Reyna into custody, Defendant Officers subjected the young men to physical and mental abuse to extract false confessions from them.

32.     Defendant Officers took Escamilla into custody on February 10, 1992. To obtain a false confession from Escamilla, Defendant Officers held him in a small interrogation room for hours and subjected him to intense interrogation. During the interrogation, among other misconduct, Defendants O'Brien and Halloran struck him and threatened to arrest his wife and take away his daughter. As a result of the Defendant Officers misconduct, Escamilla's will was overborne. Around 5:15am on February 11, 1992, Escamilla provided a false confession implicating himself, Morales, and Reyna in the shooting.

33.     Defendant Officers took Reyna into custody on the morning of February 11, 1993. To obtain a false confession from Reyna, the Defendant Officer subjected Reyna to physical and

mental abuse. For example, Defendants Halloran and Ryan beat and threatened Reyna, detained him for over 12 hours, refused him access to his mother, and made false promises that he would be able to go home. As a result of this misconduct, Reyna's will was overborne and he provided a statement falsely implicating himself, Escamilla, and Morales in the shooting.

34.     Defendant Officers also took Morales into custody on the morning of February 11, 1993. To obtain a false confession from Morales, Defendant Officers placed Morales in a small interrogation room and held him there for roughly 16 hours, told him they knew he was guilty, and struck him repeatedly. Defendant Officers subjected Morales to similar threats and physical abuse as Escamilla and Reyna, but Morales did not confess.

35.     Without a false confession from Morales, Defendants needed to manufacture additional evidence against him.

36.     To that end, Defendant Officers went to Bogan High School, where Ralphael Robinson was a student. Defendant Officers told Robinson they were taking him from school to Area 1 to view a lineup.

37.     The Defendant Officers knew that Robinson could not identify any of the perpetrators.

38.     On the way to the lineup, Defendant Officers showed Robinson several photographs, including a photograph of Morales. Robinson told Defendants that he could not identify anyone in the photographs as one of the shooters.

39.     Even though Robinson told Defendant Officers that he could not make an identification, they still had him view a lineup at Area 1. Robinson did not identify anyone in the lineup.

40.     After Robinson viewed the lineup without making an identification, Defendant Officers placed Robinson in holding cell that Robinson could not leave.

41.     Defendant James O'Brien came into the cell and showed Robinson three photos. O'Brien told Robinson "these are the guys, we know they did it," or words to that effect.

42.     Robinson told Defendant O'Brien he was not sure if any of the people in the photos or in the lineup were the offenders. O'Brien responded saying, "We're sure these are the guys. You're gonna be sure," or words to that effect.

43.     Defendant Officers returned Robinson to the lineup viewing room. Defendant O'Brien was present along with other as-yet-unidentified Defendant Officers in the lineup room. Each participant in the lineup was assigned a number. Defendant O'Brien squeezed Robinson by the neck and coached him to say the number associated with Morales's name.

44.     The Defendant Officers proceeded to write a false police report stating that Robinson identified Morales as one of the shooters and to falsely report to prosecutors that Robinson identified Morales as one of the shooters.

45.     Defendant Officers did not reveal how they induced Robinson to falsely identify Morales in the lineup nor did they disclose that Robinson told them he could not identify Morales as one of the shooters.

**Plaintiff is Charged With First Degree Murder**

46.     The Defendant Officers proceeded to ask the prosecutors from the Cook County State's Attorney's Office to approve first degree murder charges against Morales.

47.     Defendant Officers did not have probable cause to cause to charge Plaintiff with murder.

48.     The statements and identifications that Defendant Officers presented to prosecutors were false and fabricated by the Defendant Officers.

49.     Instead of giving prosecutors a truthful account of how they obtained evidence against Morales, Defendant Officers gave prosecutors false and misleading accounts of the evidence.

50.     Most significantly, Defendant Officers concealed the physical abuse and other coercive tactics they used to obtain false and fabricated statements from Willer, Escamilla, and Reyna, and they concealed the suggestive and manipulative tactics they used to fabricate an "identification" from Robinson.

51.     As a result of the Detective Officers' misconduct, Cook County prosecutors approved first degree murder charges against Plaintiff.

52.     Several weeks later, to shore up the thin case against Plaintiff, Defendant Officers arranged another lineup, this time to be viewed by 15-year-old Hendricks.

53.     The Defendant Officers knew that Hendricks could not identify any of the perpetrators.

54.     Nonetheless, on March 4, 1993, Hendricks viewed a lineup. At this point, more than a month had passed since the shooting.

55.     Although the Defendant Officers knew that Hendricks could not identify any of the perpetrators, they knew that Hendricks had been friends with the victim and was eager to help police. As with Robinson, Defendant Officers told Hendricks that they had the true perpetrators.

56.     The lineup viewed by Hendricks was highly suggestive. Among other problems, Plaintiff wore obvious jail clothing, while the other participants wore street clothes. Additionally, the Defendants put Plaintiff and Reyna in the same lineup despite knowing that this was improper.

8

57.     On information and belief, one or more of the Defendant Officers proceeded to testify before a grand jury, misleading the grand jury about the evidence against Plaintiff the same way Defendant Officers misled prosecutors to induce them to approve charges.

58.     As a result of the Detective Officers' misconduct, a grand jury returned an indictment against Plaintiff for first degree murder.

### Plaintiff's Trial and Incarceration

59.     Plaintiff was unable to post pre-trial bond and was detained at Cook County Jail while he awaited trial.

60.     Plaintiff's trial began on March 16, 1994.

61.     The prosecution's case rested heavily on the false and fabricated identifications of Robinson and Hendricks, both of whom testified.

62.     The State also called John Willer to testify against Plaintiff. Prior to trial, Willer recanted his grand jury testimony to Morales's public defender. At trial, Willer testified that the only reason he gave Halloran information implicating Morales in the murder is because Halloran and other detectives beat him, told him they believed he was involved in the murder, and threatened to charge him with the crime.

63.     The State impeached Willer's trial testimony with his grand jury testimony and his handwritten statement to Halloran. The State also offered, and the Court admitted, Willer's fabricated grand jury testimony as substantive evidence.

64.     The State also called Detective Halloran to rebut Willer's account of mistreatment by police.

65.     The State presented no physical evidence linking Morales to the shooting.

66.     On March 19, 1994, the jury returned a guilty verdict against Plaintiff.

67. At sentencing, Mr. Morales expressed sorrow for Mr. Olague's family but maintained his innocence.

68. The Court sentenced Mr. Morales to 45 years in prison.

69. Plaintiff was incarcerated continuously from his February 1993 arrest until he was released from prison in 2015, after serving his full sentence.

70. Throughout his criminal sentence and even in years after it, Plaintiff steadfastly maintained his innocence and fought to clear his name.

71. During that time, the Defendants continued to withhold critical evidence from Plaintiff, including their misconduct in securing false and fabricated identifications.

72. On October 31, 2023, the Circuit Court of Cook County vacated Plaintiff's conviction, and the Cook County State's Attorney's Office dismissed the indictment by *nolle prosequi*.

73. On June 12, 2024, Plaintiff was awarded a Certificate of Innocence.

**Defendant Officers' Pattern of Misconduct**

74. This is not the first time Defendants Boudreau, O'Brien, and Halloran have worked together to "close" a case; nor is it the first time in which the detectives used physical and psychological torture to do so. Rather, as close co-workers, and often partners, these detectives have a longstanding pattern of engaging in such misconduct. Unfortunately, none of this evidence was presented at Morales's trial.

75. In an article examining thousands of murder cases in Chicago from 1991 through 2000, *The Chicago Tribune* found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

76.     That article specifically examined inculpatory statements taken by Defendant Boudreau. According to the Tribune's survey, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but also for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them. . . . ." Maurice Posley, Steve Mills, and Ken Armstrong, "Veteran Detective's Murder Cases Unravel," *Chicago Tribune*, Dec. 17, 2001.

77.     Additionally, those cases which "have fallen apart," often involved young, Black men—just as was the case here. Defendant Boudreau has described those men as winning "the ghetto lottery," because, according to him, "convicted murderers make false accusations in order to obtain money from the City in settlements."

78.     Yet, at least 16 men, if not more, have had their convictions overturned notwithstanding confessions taken by Defendant Boudreau. The number is even higher when other Defendant Officers are also included.

79.     As these detectives' pattern of misconduct began to emerge, they have at times invoked their Fifth Amendment rights when asked questions under oath about their mistreatment of criminal suspects. When Defendants Halloran and O'Brien were questioned under oath about their treatment of Escamilla, Morales, and Reyna, they refused to answer any questions for fear of subjecting themselves to criminal liability.

80.     Examples of the Defendant Officers' misconduct include, but are not limited to:

        a.  In 1988, Halloran and a partner struck Mickey Grayer in the stomach and
            groin with a flashlight, and punched and choked him.

        b.  Demond Weston alleged that in 1990, he was abused by Moser along with
            Detectives Anthony Maslanka and Michael Kill while being interrogated.

11

Weston was arrested for murder after he was identified by Dwayne Macklin as the perpetrator. Macklin has since fully recanted his identification, alleging that he only gave it because of the police officers' physical beating, threats and promises of a lesser sentence on an unrelated charge that Macklin was facing. In 2019, Weston's conviction was vacated and the charges against him were dismissed.

c.  In 1990, Cortez Brown was tortured by O'Brien into confessing to two murders with which he had absolutely nothing to do. O'Brien, along with Detectives John Paladino and Anthony Maslanka, beat Brown about his head and body, including with a flashlight. Brown was denied food and his right to an attorney. During post-conviction proceedings, the court vacated Brown's conviction, finding the evidence of the officers pattern of misconduct "staggering" and "damning."

d.  In September 1991, Boudreau and others physically and emotionally abused 15-year-old Anthony Jakes in order to coerce a false confession for a murder Jakes did not commit. During the over 16 hours Jakes was held and interrogated, Boudreau and others slapped, punched, and kicked Jakes, threatened to recruit gang members to kill his family, tried to burn Jakes with cigarettes, and deprived him of access to food, water, and contact with an attorney of family member. Jakes was convicted of the murder based on his false confession. In 2018 his conviction was vacated, and Jakes filed a federal civil rights lawsuit against Boudreau and his cohorts.

e. Marcus Wiggins brought a lawsuit against O'Brien, Boudreau and others alleging that he was handcuffed to a wall, beaten and electroshocked while being questioned with a group of youngsters in a 1991 murder case. The detectives denied Wiggins' mother access to her son, who was a 13-year-old eighth grader at the time of the coerced confession. The other young suspects also gave confessions, many of them after being physically beaten as well. For example, Jesse Clemon and Iamari Clemon alleged that they were struck about their bodies, including with fists and flashlights. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that O'Brien and Boudreau testified that they did not hear. All of the defendants were either acquitted or had their cases *nolle prosequied* by the State. In civil depositions in an unrelated lawsuit, O'Brien and Halloran took the Fifth Amendment when asked questions about the torture of Marcus Wiggins and his co-defendants.

f. In August 1991, 15-year-old Johnny Plummer was interrogated for 36 hours by Boudreau, Halloran, and other detectives. Plummer alleged that he was hit in the face, stomach and side, including with a flashlight, by the detectives. Halloran has taken the Fifth Amendment regarding Plummer's allegations.

g. In August 1991, Curtis Milsap was slapped in the face while handcuffed and kicked in the testicles by O'Brien until he confessed to a double murder

about which he had no knowledge. Notwithstanding his confession, Milsap was ultimately acquitted of the murders.

h. Also in August 1991, George Anderson was arrested for two separate homicides. Anderson alleged that he was tortured into giving false and fabricated confessions over the course of 30 hours of police custody by Boudreau, Halloran, O'Brien and other detectives. Following proceedings before the TIRC and an evidentiary hearing, an Illinois appellate court vacated Anderson's convictions and remanded for retrials at which the State will be precluded from introducing his involuntary confessions.

i. In 1991, Boudreau again took a false confession from an intellectually disabled individual, Alfonzia Neal, whose IQ was in the 40s. After being beaten, Neal agreed to give a confession that was patently false. Neal was acquitted at trial.

j. Gregory Logan was interrogated regarding a murder in 1991 by O'Brien and other CPD detectives. When Logan professed his innocence, the detectives beat him with a bat, pushed his head against the wall and pointed a gun to his head. He was denied the right to an attorney.

k. In February 1992, Arnold Day was interrogated in connection with the murder investigation of Rafael Garcia. After isolating Day in an interrogation room for hours, Boudreau forcefully grabbed Day by the neck and choked him. The detectives also threatened to throw Day out the window. Day ultimately confessed, but was nonetheless acquitted of the Garcia murder after presenting compelling allegations of police torture.

l. In October 1992, Clayborn Smith was struck on the face and head, and punched in the ribs by Boudreau, Halloran and other detectives. The detectives also grabbed Smith's neck, pulled his hair and yanked his finger back. After 37 hours of interrogation and physical torture, Smith confessed to a murder that he did not commit. In pending post-conviction proceedings, the Court barred the state from denying that Boudreau and Halloran engaged in a pattern of abuse between 1990 and 2001.

m. In November 1992, Harold Hill, Dan Young and Peter Williams falsely confessed to rape and murder after Boudreau, O'Brien, and Halloran physically assaulted and psychologically coerced them. Hill was only 16 years old at the time and could not withstand the detectives' physical violence. Similarly, after being kicked and struck about his body, Dan Young, whose IQ was 56, also falsely confessed to a crime with which he had absolutely nothing to do. Indeed, even Peter Williams (who, it turned out, was incarcerated on an unrelated charge at the time of the rape-murder), falsely confessed after being chained to a radiator, hit with a blackjack and forced to urinate on himself. Williams was never charged; twelve years after their convictions, Hill and Young were exonerated when DNA evidence proved that they could not have been the offenders.

n. In 1992, Kilroy Watkins was interrogated by Boudreau and Halloran. Watkins was choked, punched in the face, and held for over 30 hours. Notwithstanding his actual innocence of the crime for which he was convicted, Watkins gave a confession to the detectives because he could not

15

stand further physical abuse. The TIRC has subsequently referred Watkins'
case for a hearing.

o.  In May 1993, Tyrone Hood was arrested for the murder of Marshall Morgan
Jr. Hood was interrogated and beaten about the body by Boudreau, Halloran,
and Ryan while he was held at the lockup at 51st and Wentworth. So too for
the witnesses in Hood's case, a number of whom alleged the Defendants
physically or psychologically coerced him. Hood has been granted a
Certificate of Innocence ("COI"), and his civil lawsuit against Defendants
Ryan, Lenihan, Boudreau and Halloran recently settled.

p.  Hood's co-defendant was a man named Wayne Washington. Washington
alleged that he was held for two days. During that time, he was handcuffed,
slapped in the face, had his chair knocked out from under him, threatened,
and not given food or water until he agreed to give a false and fabricated
statement inculpating himself and Hood in the murder. Washington has also
been granted a COI, and his civil lawsuit against Defendants Ryan, Lenihan,
Boudreau and Halloran recently settled.

q.  In 1993, Emmett White was arrested by O'Brien and Halloran. To secure
his confession, O'Brien and Halloran slapped White on his face and struck
White on his body. When White told the officers that he did not have
anything to say to them and was exercising his right to remain silent, the
detectives became infuriated.  The detectives again struck White about the
face and body, threw him on the ground and one of the officers stepped on
his face. Although the police alleged that White confessed to the crime,

16

when asked about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment.

r.   In 1993, Richard Anthony signed a false confession after spending 36 hours in custody with Halloran, who beat Anthony and denied him food, sleep, and use of the restroom.

s.   Richard Anthony's co-defendant, Jerry Gillespie also confessed to murder after he was kicked and slapped about the face and body and choked during 30 hours of interrogation by Boudreau, O'Brien and Halloran. Gillespie was denied the right to an attorney and threatened with further beating, including being burned with a cigarette, if he did not sign the statement that was prepared for him. Both O'Brien and Halloran have taken the Fifth Amendment on questions relating to Gillespie's allegations.

t.   In December 1993, Boudreau, O'Brien and Halloran "closed" two separate murders by coercing confessions from two intellectually disabled individuals, Fred Ewing and Darnell Stokes. One expert concluded that Ewing was "unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted notwithstanding the "confessions" obtained by Boudreau and O'Brien. O'Brien and Halloran both refused to answer questions about Ewing's and Stoke's allegations that they were beaten by O'Brien, Halloran and Boudreau when in a deposition in an unrelated civil suit.

u.  In 1994, Halloran and other police officers forced Sheila Crosby and Michael Sardin to implicate Shondell Walker in their grand jury testimonies. Halloran threatened that if Crosby did not do so, he would have the Department of Children and Family Services take her children away from her. For Sardin, the detectives threatened that if he did not name Walker as the killer, he would be charged with the murder.

v.  In 1995, Boudreau, Halloran, and others interrogated and beat Derrick Flewellen until he signed a false confession. Flewellen spent almost five years in prison before being acquitted of the two murders based on DNA tests, which proved the crime was committed by someone else.

w.  In 1994, Boudreau and Halloran beat Anthony Williams into falsely confessing to murder and armed robbery.

x.  In August 1994, David Wright was arrested and coerced into signing a false confession. Wright has testified that Boudreau physically assaulted him, including choking him and shoving him against the wall, and that Halloran made a false promise of leniency. As a result, and after an extended period in custody, Wright signed a false confession he did not write. Following an evidentiary hearing, in 2022, the conviction was vacated, and the State dismissed all charges against Wright in 2023.

y.  In 1994, Nevest Coleman was arrested for a rape and murder he did not commit. Boudreau, Halloran, and other detectives set their sights on Coleman to "solve" the case. Coleman repeatedly denied his involvement in the rape and murder, which was met with punches to Coleman's face.

Eventually, the officers fed Coleman details about the crime and Coleman falsely confessed to being a lookout. In 2016, DNA evidence exculpated Coleman and his co-defendant. In 2017, Coleman was exonerated and the state dismissed all charges

z. In 1995, Boudreau and Halloran interrogated and coerced a confession from Oscar Gomez. The detectives held Gomez for 30 hours, repeatedly beat him while he was shackled to the wall and prevented him from communicating with an attorney or with his family. Despite his "confession," Gomez was found not guilty. O'Brien and Halloran both took the Fifth Amendment when asked questions about their coercive interrogation of Gomez.

aa. In 1995, Boudreau was part of a team of detectives who physically abused John Wright until he agreed to implicate Malik Taylor and Michael Taylor in a murder.

bb. In 1995, Abel Quinones confessed to murder after being interrogated for 30 hours and being repeatedly beaten by Halloran. Despite his purported confession, Quinones was found not guilty. Halloran has pled the Fifth Amendment when asked questions about the Quinones case in an unrelated civil deposition.

cc. Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran and Boudreau interrogated him, they physically and psychologically coerced him until he lied and implicated Eric Gibson, a man who had absolutely nothing to do with the crime. Since his interrogation, Little has fully recanted the statement he gave to the police.

dd. In 1996, Jeremy Allen was wrongfully charged with murder after O'Brien coerced two witnesses into falsely identifying Allen. Allen was ultimately acquitted at trial.

ee. In February 1997, Robert Wilson falsely confessed to slashing a woman with a knife after being slapped and threatened by O'Brien. O'Brien withheld evidence from the victim that another man, one who exactly fit her description of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

ff. After police officer Michael Ceriale was shot to death in 1998, Boudreau, O'Brien and Halloran arrested then-16-year-old Jonathon Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating oral statements. To ensure Tolliver's conviction, Boudreau, O'Brien and Halloran also coerced incriminating statements from other witnesses by holding them in custody for extended periods of time, physically abusing and threatening to lodge charges against them, withholding food, and denying access to a parent or attorney.

gg. In 1998, 17-year-old Antoine Anderson was interrogated by O'Brien and Halloran about a recent murder. The detectives hit Anderson in the face and chest and threatened to take away his children. As a result of this abuse, and

20

after being held for two days at the police station, Anderson falsely confessed to a crime he did not commit.

hh. In 1998, Boudreau and others held Joseph Jackson in an interrogation room in connection with a murder investigation. When Jackson refused to confess, Boudreau and another detective placed a book on his chest and stomach and hit the book with a blackjack to avoid leaving visible marks on Jackson's body. Boudreau and the detective also put a typewriter cover over Jackson's head and cut off his air supply. Jackson eventually confessed to a murder he did not commit.

ii. In 1998, Boudreau helped extract a murder confession from a 13-year-old boy with a verbal IQ of 59. The judge later ruled the boy did not have the mental capacity to waive his rights and threw out the confession, after which prosecutors dropped the charges.

jj. Christopher Holly filed a federal civil rights lawsuit against Boudreau and other detectives alleging he was framed for a 1998 murder.

kk. In May 1994, Fabian Pico was 16 years old when he gave a self-incriminating statement to Boudreau and another detective that was used to convict him of murder. When Pico moved to suppress the statement on the grounds that police did not allow him access to his mother, Boudreau claimed he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed; but Boudreau's supposed attempt was not memorialized anywhere in his reports.

ll. Richard Malek alleges that Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, and used violence and threats to coerce his confession. Boudreau participated in this coercion as the "good cop," uncuffing Malek and providing him with a hamburger after he had been starved for an extended period. When detectives falsely claimed they obtained an oral confession, Malek filed a federal lawsuit against Boudreau and others.

mm. In 2001, Marcellous Pittman was arrested for a murder that he did not commit. During his interrogation by Halloran and O'Brien, Pittman was beaten about his body and coerced into making a false confession. In 2022, a court vacated Pittman's conviction after finding his allegations credible and specifically finding that Halloran and O'Brien tortured Pitman. The State then dismissed all charges against Pittman.

**The City of Chicago's Policies and Practices Caused Plaintiff's Wrongful Conviction**

81. The Chicago Police Department is responsible for scores of miscarriages of justice like those the Defendant Officers inflicted on Plaintiff by virtue of its policies and practices.

82. Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit—numerous of which involve the named Defendant Officers.

83. So entrenched is this pattern and practice that an Illinois court recently prevented the State from contesting that Defendants Halloran and Boudreau had a pattern and practice of abusive misconduct in their investigations that they conducted between 1990 and 2001.

22

84.     These cases include many in which Chicago police officers used the same tactics the Defendant Officers employed against Plaintiff in this case, including: (1) using physically coercive tactics to obtain involuntary, false, and fabricated confessions; (2) fabricating witness statements; and (3) concealing exculpatory evidence.

85.     At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendant Officers in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of innocent people.

86.     In 2019, the Federal Bureau of Investigation and Department of Justice admitted Chicago Police Department supervisor, Jon Burge—a supervisor for the Defendant Officers—was aware that on numerous occasions, detectives he was supervising participated in the torture and physical abuse of persons being questioned. One such detective was Defendant Boudreau.

87.     Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

88.     The municipal policy and practice set out in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that Chicago police

detectives fed information to witnesses and coached them through court-reported and handwritten statements, and physically abused witnesses.

89.     At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to other participants in the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of an investigation, rather than being maintained as part of the official file.

90.     Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff. On information and belief, the Defendant Officers also maintained clandestine files that were not turned over to the prosecutor and were destroyed or hidden at the close of the Olague investigation, including, for example, documents relating to witness interviews.

91.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536 (N.D. Ill.), among others.

92.     The policy and practice of file suppression at issue in *Fields* was in place from the 1980s through the 2000s, including during the commission and investigation of the Olague homicide described above.

93.     Additionally, a set of clandestine street files was found in the case of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.). Those files, which emanated from a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants. This means that this policy and practice was also in place during the commission and investigation of the Olague murder.

94.     In addition to the problems identified above, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

95.     Before and during the period in which Plaintiff was falsely charged with the Olague murder, and then later convicted of the Olague murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

96.     Indeed, in a review of 98 allegations of coerced confessions or fabricated evidence, culled from complaints against officers assigned to Area 1 and lodged with OPS between 1989 and 1996, OPS did not sustain a single one of these allegations.

97.     As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

98.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant Officers here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

99.     The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others: (a) The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses; (b) The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding; (c) The risks of engaging in tunnel vision during investigation; (d) The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers; and (e) the need to report misconduct committed by fellow officers.

100.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

101.     The City's failure to train, supervise, and discipline its officers, including the Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

102.     The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

103.     The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

### Plaintiff's Damages

104.     For over 22 years, Plaintiff was forced to live in confinement and serve out a punishment for a crime he did not commit. During his time in custody, Plaintiff lived in dangerous and inhumane conditions that were damaging to his physical and mental health. He was also denied the opportunity to live his life and mature into adulthood as a free person. He also lost out on opportunities to nurture relationships and share life experiences with his loved ones. As a result of the all the foregoing, Plaintiff has suffered tremendous damage, including physical injury, psychological trauma, and emotional damages, all caused by the Defendant Officers' misconduct.

**Count 1 – 42 U.S.C § 1983 – Due Process Violation**

105.   Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

106.   As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

107.   In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

108.   In addition, as described more fully above, the Defendant Officers fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

109.   The Defendant Officers concealed and fabricated additional evidence that is not yet known to Plaintiff.

110.   In addition, the Defendant Officers, acting individually, jointly and/or in concert and conspiracy, used unduly suggestive identification procedures to procure a false identification of Plaintiff that was used to deprive him of liberty.

111.   In a manner described more fully above, the Defendant Officers individually, jointly, and/or in concert and in conspiracy, deliberately withheld exculpatory evidence, and destroyed and/or intentionally lost material evidence. In doing so, the Defendants violated their clearly established duties to report all material exculpatory and impeachment information to

prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and statements.

112.    The destruction and/or loss of evidence was done in bad faith, and/or was done so that Plaintiff could not present obviously exculpatory evidence at the trial.

113.    Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

114.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

115.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

116.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

117.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal

policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

118.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

119.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

120.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

121.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

122.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**Count 2 – 42 U.S.C § 1983 – Fourth Amendment Liberty Deprivation**

123.     Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

124.     In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Plaintiff of criminal activity and detain him without probable cause.

125.     In so doing, the Defendant Officers caused Plaintiff to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments. Specifically, Plaintiff was incarcerated from the date of his arrest continuing for over 22 years.

126.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

127.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

128.     Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

129. The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

130. The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

131. Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

132. Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

133. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

134.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**Count 3 - 42 U.S.C § 1983 - Failure to Intervene**

135.    Each paragraph of this Complaint is incorporated as if restated fully herein.

136.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

137.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

138.    These Defendants had a reasonable opportunity to prevent this harm but failed to do so.

139.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

140.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

141.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

142.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

143.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

144.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

145.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

146.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**Count 4 - 42 U.S.C § 1983 - Conspiracy to Deprive Constitutional Rights**

147.    Each paragraph of this Complaint is incorporated as if restated fully herein.

148.    In the manner described more fully above, the Defendant Officers agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

149.    Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

150.    In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

151.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, conducting unduly suggestive lineups, withholding exculpatory evidence, coercing false statements, and committing perjury during hearings and trials—and was an otherwise willful participant in joint activity.

152.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

153.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

154.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

155.    The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

156.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

157.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but

also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

158.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

159.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## Count 5 - 42 U.S.C. § 1983 - Municipal Liability

160.    Each paragraph of this Complaint is incorporated as if restated fully herein.

161.    The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority.  These policies and practices included but were not limited to the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above. These policies and practices also included a practice of coercing false confessions and fabricating evidence, particularly from young men of color to close cases as described more fully above.

162.    The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiffs' constitutional rights.

163.    As a direct and proximate result of the City's actions, Plaintiffs' constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

164.    The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

### Count 6 – State Law Malicious Prosecution

165.    Each paragraph of this Complaint is incorporated as if restated fully herein.

166.    In the manner described more fully above, the Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings against Plaintiff.

167.    Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

168.    Statements of Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, used unduly suggestive lineups, and withheld exculpatory evidence that would have demonstrated Plaintiff's innocence, destroyed material and/or exculpatory evidence and used unduly suggestive identification procedures.

169.    Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the shooting.

170.    Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

171.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

172.     On October 31, 2023, the prosecution terminated in Plaintiff's favor when his conviction was vacated and all charges against him were dismissed.

173.     On June 12, 2024, Plaintiff was awarded a Certificate of Innocence.

174.     As a direct and proximate result of this misconduct, Plaintiff sustained injuries as set forth above, including psychological injury, and emotional distress.

### Count 7 – State Law – IIED

175.     Each paragraph of this Complaint is incorporated as if restated fully herein.

176.     The acts and conduct of Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, emotional distress to Plaintiff, as is more fully alleged above.

177.     As a direct and proximate result of the Defendant' actions, Plaintiff suffered and continues to suffer emotional distress.

### Count 8 – State Law Conspiracy

178.     Each paragraph of this Complaint is incorporated as if restated fully herein.

179.     As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

180.     In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

181.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

182.    As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered damages, including psychological injury and emotional distress, as is more fully alleged above.

### Count 9 – State Law *Respondeat Superior*

183.    Each paragraph of this Complaint is incorporated as if restated fully herein.

184.    In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Department, acting at all relevant times within the scope of their employment and under color of law.

185.    Defendant City of Chicago is liable as principal for torts committed by its agents.

### Count 10 – State Law Claim Indemnification

186.    Each paragraph of this complaint is incorporated as if restated fully herein.

187.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

188.    The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

189.    The City of Chicago is responsible for paying any judgment entered against the Defendant Officers.

190.    Plaintiff therefore demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendant Officers as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff Miguel Morales respectfully requests that this Court enter judgment in his favor and against Defendants City of Chicago, John Halloran, Kenneth Boudreau, James O'Brien, Gerald Carroll, Bernard Ryan, Ellen Weiss, Special Representative of the Estate of Michael Pochordo, Special Representative of the Estate of Robert A. McGuire, J. Redmond # 20248, awarding compensatory damages, interest, attorneys' fees and costs against each Defendant, and punitive damages against any of the individually named Defendants, as well as any other relief this Court deems appropriate.

### Jury Demand

Plaintiff Miguel Morales hereby demands a trial by a jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

**MIGUEL MORALES**

Dated: October 28, 2024

By: /s/ Elizabeth Mazur
*One of Plaintiff's Attorneys*

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison St., Suite 4000
Chicago, IL 60602
(312) 580-0100
emazur@hsplegal.com